IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

KEVIN DANLEY,                          }
                                       }
     Plaintiff,                   }
                                       }
                                       }     CIVIL ACTION NO.
v.                                     }     06-J-0680-NW
                                       }
RUBY ALLYN, et al.,                    }
                                       }
     Defendants.                  }


## MEMORANDUM OPINION

In the second amended complaint filed by plaintiff, Kevin Danley

("Danley"), he invokes 42 U.S.C. §1983 and seeks damages from five jail

personnel who he claims violated his constitutional rights while he was a pretrial

detainee and while they were acting under color of state law.  All defendants filed

motions to dismiss pursuant to Rule 12(b)(6), claiming that they are entitled to

qualified immunity.  This court denied defendants' said motions without opinion,

as this court, and other courts, had long done where a plaintiff's allegations of

egregious law enforcement misconduct must be taken as true.  The court believed

that the second amended complaint clearly showed on its face that defendants

were not entitled to qualified immunity.  In a sharply worded opinion, the Court of

Appeals reversed and remanded the case with instructions to this court to

"consider the case in full and to enter reasoned orders which discuss the facts alleged in the second amended complaint and detail the legal analysis used by the district court to reach its conclusions regarding the motions to dismiss." *Danley v. Allen* [sic], 480 F.3d 1090 (11th Cir. 2007).

This court assumes that the mandate permits the court to grant some or all of defendants' Rule 12(b)(6) motions.  In fact, the court detects from a between-the-lines reading of the appellate opinion that the granting of defendants' motions might be this court's safest course of action.  The Court of Appeals had before it the same twice amended complaint that this court considered; and it perfectly summarized that complaint as a contention by Danley "that [Danley] was subjected to excessive force and then denied medical treatment when, as a pretrial detainee, detention officers sprayed him with pepper spray." *Id.*

This court starts with the premise that if a state actor is qualifiedly immune from a suit brought under §1983, his immunity should be judicially recognized at the earliest practicable moment.  This is the rationale that justifies an immediate appeal from a denial of a Rule 12(b)(6) motion based on qualified immunity.  In cases where it is apparent from the face of the complaint not only that a defendant was acting within the scope of his discretionary authority during the incident complained of, but that he had no well recognized reason to believe that his

conduct violated a protected constitutional right, *Mitchell v. Forsyth*, 472 U.S. 511, 524, 105 S.Ct. 2806, 2814 (1985), provides him a remedy, that is, if the trial court has failed, as this court may have done, to see the obvious.   In fact, a defendant arguably has nothing to lose by taking his virtually pre-ordained interim appeal, even if the complaint undeniably alleges that he has committed an act of sadistic, unprovoked violence against the plaintiff.  But, does the early appeal encouraged by *Mitchell* necessarily accomplish its purpose?  In some cases, an unfounded interlocutory appeal has the opposite effect.  It prolongs the specter of ultimate liability and imposes upon the appealing defendant the substantial legal expense of the appeal.  If the defendant loses a costly and time consuming appeal, he can, and probably will, file a motion for summary judgment pursuant to Rule 56.  If his Rule 56 motion is also denied, he will probably take a second (or a third?) interlocutory appeal, although this time upon a record that will contain evidentiary material developed during discovery and thus that goes well beyond the bare allegations of the complaint.  It appears, then, that a defendant who is willing to forego an appeal at the Rule 12(b)(6) stage, may escape from the litigation thicket quicker by waiting until his Rule 56 opportunity, at which time the facts upon which his qualified immunity defense is based will be clearer and more telling.  In the case here being considered, when the Rule 12(b)(6) motions

are again denied, as they will be for the reasons that follow, the defendants will probably exercise their second right to appeal.  They, of course, have the right to do so.

The foregoing musings about the advantages and disadvantages inherent in *Mitchell* do not alter this court's clear obligation to follow the mandate of the Court of Appeals, which, as the court reads it, requires a detailed examination of the facts **as alleged**.  The only sure way to do this is to repeat *in haec verba* the allegations of the second amended complaint, all of which are deemed true for the purpose of pursuing the required qualified immunity analysis.  After the amended complaint, in the early paragraphs, introduces three defendants, Ruby Allyn ("Allyn"), Jeff Wood ("Wood") and Steve Woods ("Woods"), as Danley's jailers at the Lauderdale County Detention Center, introduces defendant, Jackie Rikard ("Rikard"), as the jail administrator, and introduces defendant, Ronnie Willis ("Willis"), as the Sheriff of Lauderdale County, Danley alleges in paragraphs 7 through 70 as follows:

7. On or about July 11, 2004, plaintiff was arrested on a DUI charge and placed in custody at the Lauderdale County Detention Center.

8. The group jail cell in which plaintiff was initially kept did not have a toilet or any water. Plaintiff requested multiple times to be able to use a toilet.

Eventually, plaintiff was taken out of the cell and taken to a small cell (5 x 7) that had a toilet in the corner and no water.

9. The toilet available to plaintiff was not sanitary, and there was no toilet paper.

10. Plaintiff complained about the unsanitary toilet and the lack of toilet paper.

11. Plaintiff told defendant Allyn he needed toilet paper (in addition to the usual reasons) to clean the "nasty" toilet so he could sit down.

12. Despite the availability of toilet paper and for no legitimate reason, defendant Allyn refused plaintiff toilet paper.

13. After going to the bathroom, plaintiff was removed from the cell so he could be transferred back to the group cell by three jailers, defendants Ruby Allyn, Jeff Wood, and Steve Woods.

14. While up to this point plaintiff had been calm, plaintiff was upset because of the denial of toilet paper and, after coming out of the cell, asked if he could please have some "fucking" or "damn" toilet paper to wipe himself.

15. Apparently because she did not like his cursing or his tone of voice, in response defendant Allyn told plaintiff, among other things, to shut up, to watch his mouth, and to get back in the cell.

16. There was no legitimate reason for defendant Allyn to order plaintiff back into the cell.

17. Defendant Allyn ordered plaintiff back into the cell solely to punish him for complaining about the lack of toilet paper and for being (in her view) disrespectful to her.

18. In response to defendant Allyn's telling him to go back into the cell, plaintiff told defendant Allyn that he was done using the toilet.

19. Instead of having plaintiff returned to the group cell, defendant Allyn told plaintiff to go back in the cell or she was going to spray him.

20. Plaintiff asked defendant Allyn why she was "fucking" with him and what "spray me" meant.

21. In response, for no legitimate security or other reason and solely for the purpose of humiliating and punishing plaintiff, defendant Allyn told one of the two other jailers present, defendant Wood, to spray plaintiff.

22. Defendant Wood sprayed plaintiff.

23. Defendants Allyn and Wood did not perceive plaintiff as a threat.

24. Plaintiff did not say or do anything that these two defendants could reasonably have perceived as a threat or as a justification for any force.

25. Recognizing this fact, defendants Allyn and Wood wrote false reports accusing plaintiff of being violent prior to the spraying in order to justify their actions.

26. Defendant Allyn intentionally tried to provoke plaintiff by denying him toilet paper, telling plaintiff to return to the cell, and then refusing to provide any explanation for her unjustified display of her power over him.

27. While plaintiff did (understandably under the circumstances) question defendant Allyn's sending him back into the cell given that he had finished using the toilet, plaintiff never refused to obey defendant Allyn. He did not say he would not return to the cell. He merely asked questions.

28. Plaintiff, though understandably upset, was surrounded by three jailers, was unarmed, had not been arrested for a violent crime, was only asking reasonable questions, and was not acting in a threatening manner.

29. Though no force was necessary, if defendant Allyn merely wanted plaintiff back in the small cell immediately, having plaintiff sprayed was unnecessary.

30. Plaintiff was standing in the doorway, and defendant Allyn could have just told the other two jailers to push plaintiff back into the cell, which they did after he was sprayed.

31. Contrary to jail policy and procedure and manufacturer instructions, which provide for a one-second burst of spray at a distance of over 3 feet, the jailer sprayed plaintiff at close range and for 3-5 seconds.

32. Defendants Allyn, Wood, and Woods knew plaintiff would be sprayed excessively, as at the jail generally and on this shift in particular it was the formal or informal policy to use pepper spray on non-violent inmates as a means of punishment for not showing proper deference.

33. Moreover, despite an opportunity to intervene to stop or mitigate the effects of the excessive use of pepper spray, all three defendants, as explained below, took steps to exacerbate the excessive spraying by denying plaintiff prompt and adequate ventilation, decontamination, and medical care.

34. Because plaintiff was in the doorway of the cell, the spray was not only on plaintiff and his clothes, but also in the air in the small cell.

35. After plaintiff was sprayed, defendants Wood and Woods pushed plaintiff back into the small cell and closed the door.

36. Plaintiff was having trouble breathing and was hyperventilating. Plaintiff was screaming and crying that he could not breathe and was begging to be let out to breathe. Plaintiff's breathing problems were such that he feared he was going to die.

37. In response, all three defendants laughed at plaintiff and made fun of him. Among other things, Wood and Woods held their hands to their necks in a mock-choking jesture.

38. Defendants Allyn, Wood, and Woods left plaintiff in the small, poorly ventilated cell for approximately 20 minutes as plaintiff screamed and cried and begged for help.

39. Jail policy and procedure and manufacturer instructions provide for inmates upon whom pepper spray has been used to be provided with prompt and adequate

ventilation and decontamination to, among other things, prevent injury from prolonged exposure, particularly to the eyes and lungs.

40. Among other things, jail policy and procedure and manufacturer instructions provide for inmates upon whom pepper spray has been used to be able to fully decontaminate, including flushing their eyes with water for approximately 15 minutes.

41. If proper decontamination procedures are followed, the effects of the pepper spray ordinarily dissipate after approximately 20 minutes.

42. All three defendants were aware of the harmful effects of prolonged exposure to pepper spray, were aware of the need for prompt and adequate ventilation and decontamination, were aware plaintiff had been sprayed with an excessive amount of pepper spray in a confined area, were aware that the cell into which plaintiff was pushed was small and poorly ventilated and contained pepper spray, listened to plaintiff's labored breathing and hyperventilating and begging for help, but did nothing for approximately 20 minutes other than make fun of him and tell him that if he did not shut up he would not be let out.

43. Even after plaintiff stopped screaming and begging, it was approximately 10 minutes before plaintiff was removed from the cell.

44. In essence, defendants Allyn, Wood, and Woods intentionally tortured plaintiff by confining him in the 5 x 7 cell after the spraying.

45. Defendants Allyn, Wood, and Woods denied plaintiff prompt ventilation and decontamination and kept plaintiff in the small and poorly ventilated cell solely for the purpose of humiliating and punishing him and not for any legitimate purpose.

46. The denial of prompt and adequate ventilation and decontamination to plaintiff was intended to cause and did cause plaintiff significant unnecessary pain and suffering.

47. After approximately 20 minutes, defendants permitted plaintiff to briefly shower (less than two minutes) but did not permit him adequate time for effective decontamination.

48. Defendants Allyn, Wood, and Woods denied plaintiff an adequate shower intentionally to prolong the harmful effects of the spray on plaintiff and thereby to inflict further unnecessary and wanton pain and suffering on him.

49. After the brief shower, plaintiff was returned to the group cell.  Because plaintiff was not permitted to promptly and adequately decontaminate, within approximately 30 minutes, plaintiff's cellmates were complaining that their eyes were burning from what was on plaintiff.

50. Because plaintiff was not permitted to promptly and adequately decontaminate and because he was not placed in a ventilated area, plaintiff continued to suffer. Plaintiff had difficulty breathing and complained about his inability to breathe throughout the remainder of his time in jail.  Plaintiff would lay on the floor and breathe through the crack under the group cell door. Plaintiff's eyes continued to burn throughout his jail stay. Plaintiff's eyes became so swollen he could hardly see.

51. Defendants intentionally did not comply with jail policy and procedure and manufacturer instructions regarding ventilation and decontamination in order to inflict unnecessary and wanton pain and suffering on plaintiff.

52. Plaintiff repeatedly requested medical treatment, but defendants refused to let him see the jail nurse.

53. Approximately an hour before plaintiff was released, over twelve hours after plaintiff was sprayed, plaintiff almost blacked out because of the breathing difficulties he had been having for the prior twelve-plus hours.

54. After another inmate intervened on his behalf with jailers, plaintiff was taken to another cell that was better ventilated. Plaintiff still was not given any medical treatment.

55. The next day plaintiff was treated by a physician for chemical conjunctivitis in his eye and irritant-induced broncospasm in his lungs. The physician prescribed plaintiff appropriate medication.

56. Plaintiff missed a day of work because of the conduct of defendants.

57. Plaintiff suffered these injuries because of the excessive use of pepper spray and the denial of prompt and adequate ventilation, decontamination, and medical care.

58. Defendants and other jailers who heard plaintiff's pleas for help and requests for medical treatment were aware of the painful and potentially injurious effects of pepper spray and knew the denial of treatment, including prompt and adequate ventilation and decontamination, would result in the unnecessary and wanton infliction of pain and suffering and could result in significant injury.

59. After the incident, plaintiff personally complained to defendants Rikard and Willis, who, after reviewing the circumstances, ratified and approved of the above-described actions of defendants Allyn, Wood, and Woods.

60. Defendants Rikard and Willis ratified and approved of the conduct of Allyn, Wood, and Woods because their conduct was consistent with de facto jail policy of permitting the excessive and punitive use of pepper spray and the denial of prompt adequate ventilation, decontamination, and medical care for inmates upon whom pepper spray has been used.

61. Prior to this incident, defendants Rikard and Willis were aware, through use of force reports and similar documents, inmate complaints, attorney complaints, jailer complaints, judicial officer complaints, and personal observation that jailers at the Lauderdale Detention Center regularly used pepper spray unnecessarily as a means of punishment and not for legitimate reasons.

62. Prior to this incident, defendants Rikard and Willis were aware, through use of force reports and similar documents, inmate complaints, jailer complaints, attorney complaints, judicial officer complaints, and personal observation that jailers at the Lauderdale Detention Center regularly used pepper spray excessively as a means of punishment and not for legitimate reasons.

63. Prior to this incident, defendants Rikard and Willis were aware, through use of force reports and similar documents, inmate complaints, jailer complaints, attorney complaints, judicial officer complaints, and personal observation that jailers at the Lauderdale Detention Center regularly denied inmates prompt and adequate ventilation, decontamination, and medical care following pepper spray discharge as a means of punishment and not for legitimate reasons.

64. In response to numerous known incidents involving the punitive use of pepper spray on inmates and the denial of prompt and adequate ventilation, decontamination, and medical care for such inmates, defendants Rikard and Willis took no action. These defendants did not discipline known incidents and did not conduct additional training despite knowledge that pepper spray was being improperly used on a regular basis by jailers and that inmates were being denied proper treatment after spraying incidents.

65. In particular, defendants Rikard and Willis were aware, prior to the incident involving plaintiff, of numerous such incidents on the shift on which Allyn, Wood, and Woods worked.  Nevertheless, the jailers engaging in this pattern of abuse were not disciplined for their actions or provided with additional training.

66. The punitive misuse of pepper spray was such a regular occurrence at the Lauderdale County Detention Center that, to the extent it was not explicit policy, it was the de facto policy. Jailers at the Lauderdale Detention Center came to believe that virtually any use (misuse) of pepper spray would be tolerated.

67. More generally, prior to this incident, defendants Rikard and Willis were aware through use of force reports and similar documents, inmate complaints, jailer complaints, attorney complaints, judicial officer complaints, and personal observation that jailers at the Lauderdale Detention Center regularly used force other than pepper spray on inmates as a means of punishment and not for legitimate reasons.

68. In response to known incidents of excessive force, defendants Rikard and Willis regularly failed to discipline or in any effective manner deal with the involved jailers. Jailers who mistreated inmates were either not disciplined at all or

inadequately disciplined. Clearly excessive uses of force were determined to be justified or simply ignored.

69. The effect of the responses of Rikard and Willis to known incidents of excessive and punitive use of force on inmates was to permit, encourage, and ratify a pattern and practice of unjustified, unreasonable, excessive, and punitive use of force by jailers.

70. The conduct of Rikard and Willis effectively made the excessive use of force on inmates a de facto policy in the Lauderdale Detention Center.

Based on this elaborate set of facts, Danley contends that he was subjected to cruel and unusual punishment and was the victim of deliberate indifference to his observable medical needs in violation of his rights as a pretrial detainee under the Fourteenth Amendment, which incorporates the protections granted by the Eighth Amendment to persons in custody after conviction. The Court of Appeals instructed this court to express its opinion less perfunctorily than it did in its earlier opinion as to whether Danley's allegations describe deprivations that were contrary to clearly established constitutional principles.

The Court of Appeals did not discuss, or even mention, the heightened pleading standard that defendants urge upon the court. This court agrees with defendants that "a higher pleading standard is alive and well in Eleventh Circuit qualified immunity jurisprudence." After two amendments to his complaint, Danley can hardly be expected to provide more factual detail, or more specificity,

than he provides in paragraphs 7 through 70 of his amended complaint. Admittedly, he occasionally slips into conclusory allegations, but he sets forth in graphic detail a series of facts that meet the Eleventh Circuit higher pleading standard.  The inquiry, then, is not about the quality of Danley's pleading, or his rendition of the facts, but whether the facts, as he alleges them, demonstrate conduct by defendants, or any of them, that crosses the constitutional bright line.

Although Justices Stevens and Blackmun did not fully join the five Justice opinion written by Justice O'Connor in *Hudson v. McMillian*, 503 U.S. 1, 9112 S. Ct. 995, 1000 (1992), the said two Justices did concur sufficiently to provide an irrefutable seven Justice Supreme Court consensus that substantial injury is not required to sustain a claim of cruel and unusual punishment where there is "unnecessary and wanton infliction of pain" (*quoting Whitley v. Albers*, 475 U.S. 312, 320-321, 109 S.Ct. 1078, 1084-1085 (1986)), and that "contemporary standards of decency always are violated" when "prison officials maliciously and sadistically use force to cause harm."  These concepts were reiterated and reenforced in *Hope v. Pelzer*, 536 U.S. 730, 737, 122 S.Ct. 2500, 2514 (2002), in which the Supreme Court again explained that the unnecessary and wanton infliction of pain always constitutes the "cruel and unusual punishment" that is constitutionally forbidden.  Thus, the "clearly established" test for evaluating such

an offending circumstance, as enunciated in *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982), is met by applying this generalized principle, and there was no need for a particularized "fair warning" beyond the broad warning contained in *Hudson*.  As an interesting aside, John G. Roberts, Jr. (now Chief Justice Roberts), appeared *amicus curiae* on behalf of Hudson, the prevailing petitioner in *Hudson*.

The lesson of *Hudson*, if applied to the facts alleged by Danley, provided more than "fair warning" to all of these defendants that to employ pepper spray as punishment, or for the sadistic pleasure of the sprayers, as distinguished from what is reasonably necessary to maintain prisoner control, is constitutionally prohibited. At the present juncture, Danley's rendition of the facts, that include taunts, reflects an angry and inexcusable response by the jailers to Danley's bad language after the dispute over toilet paper that undoubtably aggravated Danley.  On the facts as alleged, nothing Danley did or said justified the repeated discharge of pepper spray in his face accompanied by choking gestures.  Allyn, Wood and Woods may ultimately give testimony to justify a need to pepper spray Danley, just as they claimed in their work reports after the incident, but as of now, the allegation (and therefore the "fact") is that those reports were no more than an attempt to cover up their misdeeds.

14

*Hudson* and its progeny fit this case.  They provide all the warning that these jailers were entitled to, that is, unless after *Hudson* and *Pelzer* were decided the use of pepper spray has become such a routine and recognized prison practice that it has evolved into a practice that meets current standards of decency and has become constitutionally acceptable behavior even when infected with malicious intent.  This court does not believe in such an evolution.  There is nothing in Danley's complaint to suggest that he posed a physical threat to any of the defendants or to other inmates.  Defendants can point to no case that approves the pepper spraying of an inmate just to shut his mouth.

There is, of course, a difference between the standard to be applied to the three actual pepper sprayers and their supervisors who were not physically present during the use of the spray.  That distinction need be explored only if the use of pepper spray by defendants, Allyn, Wood and Woods, crossed the clear boundary of Fourteenth Amendment unconstitutionality, as this court thinks it did.  Danley's allegations are not that Rikard and Willis are liable under a theory of *respondeat superior*, but that because an unconstitutional practice was created or condoned by them, they became actual participants.

It is true that the burden is not on a jailer to point to a decision that expressly approves of his conduct.  The burden is on a plaintiff to show that the

15

jailer had every reason to know not to do what he did under the particular circumstances existing at the time of the act.  The closest Eleventh Circuit case this court has found on the question of when pepper spraying is permitted and when precluded is *Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002), a case that predated the incident here under review and therefore clearly established the legal principles applicable to a similar circumstance.  It teaches, like *Hudson* did in a generic way, that pepper spray cannot be used as a device for punishment or retribution. *Id.* at 1348-1349.   Pepper spray can be used only as a means of controlling a pretrial detainee's dangerous conduct.  This court knows that a can of pepper spray, like a police baton or a stun gun can be legitimately used by law enforcement personnel to protect themselves and to maintain control.  But, Danley's conceded verbal belligerence without more did not justify the use of a baton, or of a stun gun, or of pepper spray.  Everybody familiar with pepper spray, including these defendants, knew or should have known that pepper spray causes injury and probably likely requires medical intervention after its use.

*Vinyard* is an Eleventh Circuit case closely on point because it deals expressly with the propriety of using of pepper spray on a person in custody.  Like the instant case, *Vinyard* involved the use of pepper spray after verbal insults by

the prisoner.  There, the detainee, Vinyard, admitted that she "may have become 'a

little rowdy.'"  *Id.* at 1344.  Nevertheless, the Eleventh Circuit held:

> While the parties do not cite and we have not located Supreme Court,
> Eleventh Circuit, or Georgia Supreme Court decisions regarding
> pepper spray use in the course of an arrest, other courts have
> addressed its use.  Courts have consistently concluded that using
> pepper spray is excessive force in cases where the crime is a minor
> infraction, the arrestee surrenders, is secured, and is not acting
> violently, and there is no threat to the officers or anyone else.  Courts
> have consistently concluded that using pepper spray is reasonable,
> however, where the plaintiff was either resisting arrest or refusing
> police requests, such as requests to enter a patrol car or go to the
> hospital.  Furthermore, "'as a means of imposing force, pepper spray
> is generally of limited intrusiveness,' and it is 'designed to disable a
> suspect without causing permanent physical injury.'" *Gainor v.
> Douglas County*, 59 F.Supp.2d 1259, 1287 (N.D. Ga. 1998) (quoting
> *Griffin v. City of Clanton*, 932 F.Supp. 1359, 1369 (M.D. Ala. 1996).
> Indeed, pepper spray is a very reasonable alternative to escalating a
> physical struggle with an arrestee.
>
> Based on Vinyard's account of the facts, it is abundantly clear to us
> that during the jail ride Stanfield "used force that was plainly
> excessive, wholly unnecessary, and, indeed, grossly disproportionate
> under *Graham*." [*Lee v. Ferraro*, 284 F.3d at 1188, 1198 (11th Cir.
> 2002)].  Vinyard was under arrest for offenses of minor severity,
> handcuffed, secured in the back of a patrol car, and posing no threat
> to Officer Stanfield, herself or the public.

*Id.* at 1348 (footnotes omitted).

This court notes that the pepper spray used in *Vinyard* was to "subdue" the

detainee and was not, as here alleged by Danley, for the sadistic pleasure of the

custodial officers.  In other words, Danley's facts suggest much worse behavior by

the defendants than the defendants in *Vinyard*.  And yet the Eleventh Circuit there had no problem finding a constitutional violation and no qualified immunity for the defendants.  This court concludes that after *Vinyard* any jailer should have known that to repeatedly pepper spray a prisoner in custody, and to seemingly enjoy it, constitutes conduct that is "clearly established" to be a violation of a constitutionally protected right of the prisoner.  Of course, the court has not yet heard from the defendants.  Ultimately, Danley's rendition of the facts will be hotly contested.  For the moment, however, the facts as Danley alleges them, are true.  As such, they preclude, as of now, the defense of qualified immunity interposed by Allyn, Wood and Woods, the three defendants who engaged in the pepper spraying of Danley.

The claim against the two supervising defendants, Rikard and Willis, proceeds, if at all, under a different theory, namely, alleged indirect participation by them in the actions of the pepper sprayers themselves, in the form of creating or maintaining a custom and practice in accordance with which the actual sprayers acted, and thus with the deemed authorization of Rikard and Willis.  Whether Danley will be able to prove such a well understood, widespread and constant use of pepper spray that the two supervisory defendants, or either of them, can be deemed to have participated remains to be seen.  Meanwhile, to tolerate or

18

encourage the sadistic use of pepper spray arguably renders a supervisor liable under 42 U.S.C. § 1983.  Without having conducted any discovery, Danley has done a creditable job of **alleging** facts and circumstances to show that Rikard and Willis created an atmosphere or practice under which the three hands-on employees operated in, and that can create supervisory liability without resort to *respondeat superior*.

A recent Eleventh Circuit decision that makes a distinction between the liability of a supervisor and the liability of a direct actor is *Gonzales v. Reno*, 325 F.3d 1228 (11th Cir. 2003).  In that case the Eleventh Circuit pointed out:

> Plaintiffs state that there is a causal connection between these defendants' acts and the excessive force used by the agents on the scene, but they do not allege any facts to support this causal connection.  Plaintiffs do not allege that these defendants directed the agents on the scene to spray the house with gas, break down the door with a battering ram, point guns at the occupants, or damage property.

*Id.* at 1235.

The Eleventh Circuit thereupon granted the motion of the supervisory defendants, including Attorney General Reno, to dismiss under Rule 12(b)(6).  This court finds *Gonzales* distinguishable on its facts.  Danley is no more alleging in the instant case that Ricard and Willis actually **directed** Allyn, Wood and Woods to pepper spray him than Gonzales was alleging that Attorney General Reno actually

directed the complained of actions by her agents.  As distinguished from Gonzales, Danley alleges facts that, taken as true, demonstrate a custom and practice created by the supervisory defendants upon which their agents acted as if by direction.

Danley's claim of deliberate indifference is simply an elongation of his complaint of the use of excessive force.   It need not be addressed as a distinct constitutional tort.  There may be an occasion in which a failure to provide adequate medical treatment to a person who has been **appropriately** pepper sprayed would be so egregious that it would create a separate cause of action under 42 U.S.C. § 1983, but defendants' alleged failure to provide adequate medical treatment in this case is no more than a continuation of Danley's excessive force claim, at least for the purposes only in the Rule 12(b)(6) motions, none of which ask this court to separately consider the excessive force claim and the deliberate indifference claim.

## Conclusion

Based on the foregoing, the defendants' motions to dismiss will be denied by separate order.

DONE this 24th day of April 2007.

_____
INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE